## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA

**ALIGN INSURANCE GROUP, LLC**                                     **PLAINTIFF**

**vs.**                               **CIVIL ACTION NO. _____**

**JUSTIN TAYLOR**
**HARPER KRANZ**
**PLATINUM GLOBAL INSURANCE AGENCY, INC.**                **DEFENDANTS**

## <u>COMPLAINT</u>

COMES NOW Plaintiff Align Insurance Group, LLC ("Align" or "Plaintiff") by and through its counsel, and for its Complaint against Defendants Justin Taylor, Harper Kranz, and Platinum Global Insurance Agency, Inc. (collectively, "Defendants"), states:

## INTRODUCTION

1.      This case concerns the sale of a business, the promise of restrictive covenants related to that sale, and a deliberate effort to breach those covenants.  Defendant Justin Taylor sold an insurance book of business to Align for the sum of $400,000.00 in cash and a 20% interest in Align and then took the customers comprising that book of business back after the sale was consummated and after Taylor sold his 20% interest back to Align.  Taylor did this, with the help of Defendant Harper Kranz, by soliciting Align's customers to Defendant Platinum Global Insurance, where Taylor and Kranz now work.  In doing so, Taylor breached his contract with Align, including, without limitation, his non-competition and non-solicitation agreements, and, in conjunction with Defendants Kranz and Platinum, perpetuated fraud on Align.  In short, Taylor defrauded Align out of at least $400,000.00 by selling its book of business to Align and then taking it back shortly thereafter.

2.      Additionally, apart from the above, Taylor stole $104,747.57 from Align by using his access to Align's bank accounts to wire $104,747.57 from Align to his personal account.

## PARTIES

3.      Plaintiff Align Insurance Group, LLC is an Alabama limited liability company with its principal place of business in Daphne, Alabama and doing business in Baldwin County, Alabama at all relevant times.  Align provides insurance agent, broker, and producer services to insurance customers in Alabama and Florida.

4.      Defendant Justin Taylor is an Alabama resident living in Baldwin County, Alabama at all relevant times.

5.      Defendant Harper Kranz is an Alabama resident living in Baldwin County, Alabama at all relevant times.

6.      Defendant Platinum Global Insurance Agency, Inc. ("Platinum") is a Louisiana Corporation with its principal place of business in Slidell, Louisiana and doing business in Louisiana and Alabama at all relevant times.  Platinum conducts the same type of business as Align and is in competition with Align in Alabama and Florida.

## JURISDICTION, AND VENUE

7.      This Court has federal question jurisdiction over Defendants' violations of the Racketeering Influence Corrupt Organizations Act ("RICO") pursuant to 18 U.S.C. § 1964(c).

8.      This Court has jurisdiction of state law claims in this case pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

9.      Venue is proper in the Southern District of Alabama pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the Defendants' conduct occurred in Baldwin County, Alabama, which is in the Southern District of Alabama.

**FACTS**

10.     In July 2020, Justin Taylor was an owner of a holding company named, BT Holdings, LLC ("BTH"), which wholly owned three subsidiary companies: Middle Bay Insurance, LLC ("Middle Bay"), Houseal Insurance ("Houseal"), and Marine & Industrial Brokers, LLC ("Marine Industrial") (collectively, the "Taylor Entities").

11.     The Taylor Entities provided insurance agent and brokerage services and held a book of business of insurance customers, which Taylor represented to Align as having a fair market value of $400,000.00 or more.  In the insurance industry, a "book of business" is the phrase used to describe a company's insurance customers.

12.     In 2020, representatives of Align and Justin Taylor began discussions regarding Align purchasing the Taylor's Entities' book of business via a membership interest purchase agreement.

13.     On August 4, 2020, Align Insurance Group, LLC ("Align") purchased from Justin Taylor 100% of the membership interest in BTH (and, by extension, the Taylor Entities) for a purchase price paid by Align to Taylor that comprised a cash payment of $400,000.00 and a 20% membership interest in Align.  **Exhibit 1** (Membership Interest Purchase Agreement).[1]  The acquisition of the Taylor Entities' insurance customers' business (i.e., the Taylor Entities' book of business) was a material part of the Membership Interest Purchase Agreement.

14.     The Taylor Entities' customers were not made aware of Align's purchase of the Taylor Entities and continued their business with the Taylor Entities after ownership changed to Align.

---

[1] Taylor was a co-owner of BTH with William J. Brennan.  Mr. Brennan is not relevant to this lawsuit.

15.     As part of the transaction stated above, Taylor gained a 20% ownership interest in Align, and Taylor's employees who worked for the Taylor Entities, including Harper Kranz, came to work for Align.

16.     On July 22, 2022, Align purchased Taylor's 20% interest in Align and entered into an employment agreement with Taylor (the "Employment Agreement").  **Exhibit 2** (Taylor 20% Interest Purchase Agreement); **Exhibit 3** (Employment Agreement).

17.     As a condition of Taylor's employment with Align, the Employment Agreement contained covenants not to compete, not to solicit customers or employees, and not to disclose confidential information.  **Exhibit 3**.  Specifically, the Employment Agreement provides in pertinent part:

> Non-Competition. During the Restricted Period, Employee shall not, whether on Employee's own behalf or on behalf of, in conjunction with, or through any other individual, partnership, limited partnership, limited liability partnership, limited liability company, corporation, unincorporated association, joint stock company, joint venture, trust, business trust, or other entity, or any governmental authority (each, a "Person"), directly or indirectly, (i) engage in, or assist other Persons in engaging in, the Restricted Business in the Restricted Area, (ii) acquire any interest in, or render services to, any Person that engages in, directly or indirectly, the Restricted Business in the Restricted Area in any capacity, including, without limitation, as a partner, principal, equity holder, creditor, trustee, or otherwise, or (iii) interfere with, or attempt to interfere with, the business relationships (whether formed before, on, or after the Date of Termination) between any Person within the Company Group, on the one hand, and any of the customers, suppliers, distributors, trades, subcontractors, lessors, lessees, licensors, licensees, creditors, and others having business dealings or relations with any Person within the Company Group and with whom Employee had contact during the Term, on the other hand. Notwithstanding the foregoing, Employee is permitted to, directly or indirectly own, solely as an investment, securities of any Person engaged in the Restricted Business in the Restricted Area that are publicly traded on a national securities exchange if Employee (A) is not a controlling person of, or a member of a group that controls, such Person, (B) does not, directly or indirectly, own two percent (2%) or more of any class of securities of such Person, and (C) has no active participation in the business of such Person.

**Exhibit 3**, at ¶ 6(a).

4

> Non-Solicitation. During the Restricted Period, Employee shall not, whether on Employee's own behalf or on behalf of, in conjunction with, or through any Person, directly or indirectly, (i) hire, solicit, induce, or encourage (or attempt to hire, solicit, induce, or encourage) any employee of any Person within the Company Group or encourage (or attempt to encourage) any employee or independent contractor of any Person within the Company Group to leave such employee's employment or independent contractor's engagement with such Person, except, in each case, solely pursuant to a general solicitation that is not directed specifically to any such employee or independent contractor, or (ii) otherwise interfere with (or attempt to interfere with) the relationship between any Person within the Company Group and any employee or independent contractor of such Person. Notwithstanding the foregoing, Employee is permitted to hire or engage any such employee or independent contractor whose employment or engagement with all Persons within the Company Group has terminated after one (1) year from the date of such termination, subject, in each case, to any non-competition, non-solicitation, confidentiality, and other similar agreements between any Person within the Company Group and such employee or independent contractor.

**Exhibit 3**, at ¶ 6(b).

> "Restricted Area" means all counties in the State of Alabama and the State of Florida in which (A) the Company has conducted business, or (B) 68 Ventures, LLC, an Alabama limited liability company, has conducted business.

> "Restricted Business" means any business engaged directly or indirectly in competition with the businesses of the Company or its Subsidiaries as such businesses exist or are in process during the Restricted Period.

> "Restricted Period" means during the Term and thereafter until the date that is the 3-year anniversary of the Date of Termination.

**Exhibit 3**, at ¶ 6(c).

18.    The Agreement also contained a clause prohibiting the disclosure of Align's

confidential information:

> Non-Disclosure. Employee acknowledges and agrees that, in and as a result of employment under this Agreement, Employee will be making use of, acquiring knowledge of, and/or adding to confidential or proprietary information of or relating to the Company Group, including, without limitation, the Company Group's systems, procedures, policies, manuals, marketing plans, marketing strategies, trade secrets, business plans, financial data, financial statements, methods of conducting business, pricing formulas, research, designs, technology, concepts, inventions, discoveries, research and development activities, confidential reports, and all other information, knowledge, or data of any kind or nature relating

5

to the products, services, or business of the Company Group, including, without limitation, any information or data of the type described above provided to the Company Group by third parties (collectively, "Confidential Information"); provided, however, Confidential Information does not include any information that: (i) becomes generally available to the public other than as a result of a disclosure by or through Employee; or (ii) is obtained by Employee from a third party who is not subject to any confidentiality or fiduciary obligations with respect to such information. As a material inducement to the Company to enter into this Agreement, Employee covenants and agrees that Employee shall not, at any time during or following the Term, directly or indirectly, except in furtherance of the Company Group's businesses and in accordance with the Company Group's policies, use, disseminate, divulge, or disclose, for any purpose whatsoever, any Confidential Information. Employee shall take reasonable and appropriate steps to safeguard the Confidential Information and to protect the Confidential Information against disclosure, misuse, espionage, loss, and theft.

**Exhibit 3**, at ¶ 5(a).

19.     From August 4, 2020 to September 23, 2022, Taylor's position at Align was President of Commercial Lines.  From August 4, 2020 to July 22, 2022, Taylor was also an owner of Align.

20.     Taylor's role at Align was to lead the commercial department and oversee the commercial team, which included Harper Kranz, and was tasked with growing the commercial business and team through networking, sphere of influence, marketing, and more.  Taylor was also tasked with setting goals for the team to reach and tracking Align's goals and growth.

21.     Taylor, both as an owner and executive employee of Align, owed Align a fiduciary duty to act honestly and for Align's best interest and to avoid acts of self-dealing.

22.     Kranz was employed at Align from August 4, 2020 to October 18, 2022. Kranz's position at Align was Insurance Producer.  His job was to network and build both personal and commercial accounts.  Kranz, as an employee of Align, owed Align a fiduciary duty to act honestly and for Align's best interest and to avoid acts of self-dealing.

23.     During their employment, both Taylor and Kranz gained and were granted access to proprietary and confidential information and trade secrets of Align.  This included, without limitation, Taylor and Kranz having access to Align's confidential and proprietary customer lists, pricing information, financial data, and business plans, including marketing and development strategies.

24.     While employed, Taylor and Kranz continued to conduct their business operations under the name Marine Industrial and Middle Bay despite repeated requests by Align's management to roll all company operations under the Align brand.  Without limitation, Taylor and Kranz maintained separate email addresses and used—against Align's direction—separately branded communications in an effort to maintain the separateness and portability of the book of business that Align purchased from them.

25.     On September 23, 2022, approximately two months after entering the Employment Agreement with Align and selling his 20% membership interest back to Align, Taylor left his employment at Align.  Shortly thereafter, the employees that came to work for Align from the Taylor Entities, including Harper Kranz, terminated their employment with Align.

26.     Taylor and Harper began working for Defendant Platinum Global Insurance immediately.  After leaving their positions at Align, the customers that Align purchased from the Taylor Entities left Align and went to Platinum Global Insurance, which is evidenced by the customers changing their insurance Agent of Record (AOR) from Align to Taylor's new company, Platinum.  *See* **Exhibits 4-17**.

27.     Upon investigation of the loss of business, Align learned that Taylor and Kranz directly and indirectly solicited Align's customers to switch to Platinum as their insurance agent.

28.     Specifically, Taylor and Kranz, at Taylor's direction, contacted Align's customers, spread disparaging information about Align to the customers, and convinced the customers to switch their business from Align to Platinum by changing their insurance Agent of Record from Align to Platinum.

29.     Additionally, Taylor solicited Align's employees, including, without limitation, Harper Kranz, to leave employment with Align and work for Platinum.

30.     Taylor and Kranz, at Taylor's direction, personally helped Align's customers complete the change of AOR forms to move their business from Align to Platinum.  For example, attached hereto as **Exhibit 18** is an email from Harper Kranz to one of Align's customers where Kranz tells the customer that he has "attached [the] forms to move the FMBC policies over to our new agency (Platinum)."  **Exhibit 18** (Kranz Email).  Kranz specifically uses the term "our new agency," evidencing Taylor's involvement with Platinum.  *Id*.

31.     Because Kranz was already the Broker of Record for many of Align's customers (via his employment with Align), Defendants were able to use Kranz's status as the customers' Broker to submit their own AOR change form for the customers to move to Platinum.  For example, attached as **Exhibit 19** are emails showing where Kranz submitted AOR forms for Align's customers to move to Platinum.  **Exhibit 19** (Broker Emails).

32.     The following are customers that Defendants solicited from Align to Platinum who already submitted Change of AOR forms evidencing their move to Platinum:

- Bethel Flooring & Painting (**Exhibit 4**)

- Children of the World (**Exhibit 5**)

- Friendship Missionary Baptist Church (**Exhibit 6**)

- Wattier Surveying (**Exhibit 7**)

- Kids Zone of Tillman's Corner (**Exhibit 8**)

- KinderKids Learning Center (**Exhibit 9**)

- H.G. Harders & Son, Inc. (**Exhibit 10**)

- New Industries (**Exhibit 11**)

- Oil Recovery Co. Inc. (**Exhibit 12**)

- P & H Construction Corporation (**Exhibit 13**)

- Tesecon (**Exhibit 14**)

- Tex Edwards, Co. Inc. (**Exhibit 15**)

- Esfeller Construction Company, Inc. (**Exhibit 16**)

- Mobile's U-Drive-It (**Exhibit 17**)

33.     The following is the full list of customers that were a part of the Taylor Entities' book of business and which have now either switched to Platinum or have stated that they are switching to Platinum: Green Arrow, LLC; Green Rock Strategies, LLC; Wet Waste Management, LLC; Southern Logistics; Coastal Waste Services LLC; Alluvial LLC; Flat Calm, LLC; SLI Land; Company LLC; MLC Properties LLC; WDC Companies; RTI Environmental; TRMC LLC; WCTT LLC; Crown Point; New Day Ministries; Tesecon; Oil Recovery; Tex Edwards; P & H Construction Corp; New Industries; HG Harders; Coastal Dock & Bulkheads; Layco Marine; Shale Lodging; Belforest Storage Schambeau; Sweetwater Investments; Esfeller; Wattier Surveying; Flexicrew; KinderKids; Stars Early Learning Academy; Mobile's U-Drive-It; Warehouse Bakery & Donuts; Pioneer Pool Products; FC Holdings; Ecumenical Ministries; Timothy Bailey PLS; Fairhope Roasting Co; Lkids Zone of Tillmans Corner; FC Holdings; Children of the World; William Brennan; Southeast Environmental Services; Amaia's Cleaning; Seale Marine; Blessed Beginnings Child Development Center; C.S.J LLC; Lores Realty; Wireless;

Infrastructures; Lulu's Landing; Bethel Flooring and Painting; Culpeo Technologies, LLC; Mac Mill Properties, LLC; Lucy Ladd; Fairhope Fish House; and Jake Pose.[2]

34.     All of the above customers listed are located within the Restricted Area set forth in the Employment Agreement, and all of said customers switched their business from Align to Platinum through Taylor and/or Kranz at Taylor's direction.  Platinum is a "Restricted Business" as that term is used in the Employment Agreement, and Taylor solicited Align's customers to Platinum during the Employment Agreement's "Restricted Period" and is actively servicing the customers as an employee, agent, and/or owner of Platinum during the Employment Agreement's Restricted Period.

35.     Taylor acted through Kranz and Platinum to solicit the above customers away from Align to Platinum.  Attached as **Exhibit 20** are notes obtained from outside Justin Taylor's residence which evidence a coordinated effort between Taylor, Kranz, and Platinum to lure customers away from Align to Platinum.  **Exhibit 20** (Taylor Notes).  Specifically, the notes reference "PGIA" (i.e., Platinum Global Insurance Agency) and contain the names of certain customers of Align that have now switched to Platinum such as "Crown Point" "Esfellar," and "HG Harders."

36.     The above-named companies were under the management of Justin Taylor when Taylor was at Align and are now under Taylor's management at Platinum.

37.     Moreover, when customers that moved from Align to Platinum were asked why they made the switch, the customers replied that they followed Justin Taylor or Harper Kranz there.

38.     Attached hereto as Exhibit 21 is an email from underwriter, Rainey Insurance, to Harper Kranz, with the subject line of the email titled "Platinum Global Insurance Agency, Inc."

---

[2] Upon information and belief, this list is current as of the date of filing of this Complaint.  However, Plaintiff expects additional customers to switch to Platinum after filing.

in which Rainey Insurance requests information regarding Kranz's new, startup company, including its business plan. **Exhibit 21**. This evidences Kranz being involved with Platinum on an ownership and/or executive level and, when considered in conjunction with Taylor's discarded notes (Exhibit 20) evidence Taylor and Kranz's involvement in the startup and/or ownership of Platinum. **Exhibit 20**; **Exhibit 21**.

39.     Defendant Taylor engaged in a scheme, through the assistance of Kranz and Platinum, to sell the Taylor Entities' book of business to Align and then take that business back after Align paid Taylor (the "Scheme to Defraud Align").

40.     As part of the Scheme to Defraud Align, Taylor falsely represented that he would not compete with Align for a period of three years from the date following the termination of his employment with Align while knowing such statement was false and even actively commenced competition with Align during his tenure as an owner and employee of Align.

41.     Additionally, as part of the Scheme to Defraud Align, Taylor failed to disclose to Align that the customers' underwriter, Gray & Company, Inc. ("Gray Insurance) demanded, as part of the underwriter-agent relationship, commission payments to be paid to Gray Insurance in the amount of 8 to 10 percent of customers' premiums.

42.     As part of the Scheme to Defraud Align, Defendants solicited Aligns' customers and convinced them to move their business to Platinum in Louisiana.

43.     In furtherance of the Scheme to Defraud Align, in November and December 2022, upon information and belief, Defendants sent money to and from Alabama and Louisiana, emails to and from Alabama and Louisiana, and placed calls to and from Alabama and Louisiana regarding Platinum's unlawful acquisition of Align's customers.

44.     Specifically, upon information and belief, Defendants Taylor and Kranz sent emails from Alabama to Platinum in Louisiana regarding their plan to transfer Align's customers to Platinum.  Additionally, upon information and belief, Defendants Taylor and Kranz sent emails from Alabama to Align's customers located in Florida in furtherance of the Scheme to Defraud Align.

45.     This is not the first time that Justin Taylor engaged in such a scheme.  Upon investigation, it was discovered that Taylor has, on at least three other occasions, sold his book of business to buyers for a substantial sum of money and then took the customers back after the sale was completed.

46.     The insurance underwriter for the customers listed herein, Gray Insurance, has admitted that Platinum, through Taylor and Kranz, have taken Align's customers to Platinum, where Taylor and Kranz both work.  Upon information and belief, Taylor and/or Kranz hold a financial interest in Platinum.

47.     Taylor and Kranz engaged in a coordinated, unlawful effort to solicit Align's customers to Platinum.

**DEFENDANT TAYLOR'S CONVERSION**

48.     When investigating the events alleged in this Complaint, Align discovered that, on December 29, 2020, Taylor, unbeknownst to and without authorization from Align, transferred $104,747.57 to BT Holdings National Trustmark Bank Account ending in x8992 for Taylor's personal benefit.  This illegal transfer was immediately reported to the Federal Bureau of Investigation.

49.     BT Holdings National Trustmark Bank Account ending in x8992 was not disclosed to Align when it purchased the Taylor Entities, and Align does not have access to said account.

50.     Taylor's wire transfer of Align's money to the BT Holdings' Bank account involved the transfer of money across state lines and interstate commerce.  Specifically, the wire transfer was sent from Align's account in Alabama to Trustmark's headquarters in Mississippi and then to Taylor's bank account in Alabama.

## CAUSES OF ACTION

### I.      BREACH OF CONTRACT (Taylor)

51.     Align repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

52.     Taylor breached the (1) non-competition, (2) non-solicitation, and (3) non-disclosure provisions of the Employment Agreement.

53.     Taylor's Employment Agreement was, and is, a valid, reasonable, and enforceable written contract.

54.     The Employment Agreement is supported by valid consideration, including but not limited to Taylor's employment and/or continued employment with Align at the time of its execution.

55.     Align performed all its obligations under the Employment Agreement.

56.     According to the Employment Agreement, Taylor agreed not to use, disseminate, disclose, publish, or otherwise make available any trade secrets, confidential and proprietary information of Align.

57.     Additionally, Taylor agreed that during his employment and for a period of three years following termination, he would not compete with Align by engaging in activities or offering products or services of the type conducted or provided by Align.

58.     Further, Taylor agreed to refrain from soliciting or attempting to solicit any business from Align's customers for three years following termination of his employment.

59.     Taylor violated the covenants contained in the Employment Agreement through his conduct described in the Paragraphs above, including soliciting and servicing Align's customers, participating in a competing business, soliciting Align's employees, and using and disclosing trade secrets and confidential information to Platinum regarding Align's business, all in concert with Defendants Krantz and Platinum.

60.     The restrictions in the Employment Agreement are intended to protect Align's customers and employees, good will, its investment and development of substantial relationships with customers and employees, its trade secrets and confidential information, and other valid business interests of Align, including, but not limited to, safeguarding against unfair competition.

61.     As a direct and proximate result of Taylor's breach of contract and violations of his obligations and interference with customer relationships, Align has been and will continue to be damaged and irreparably injured including present and future economic loss, loss of customer accounts, loss of customer relationships, lost profits, loss of goodwill, loss of its competitive position, diminished competitive advantage, and other damages and future damages which are incapable of exact proof.

62.     Taylor's actions were taken intentionally, maliciously, and with the intent to injure and/or oppress Align, thereby entitling Align to punitive damages.

63.     Align has a protectable interest in its confidential information and trade secrets, and such confidential information and trade secrets are unique to Align's business and essential to its business operations.

64.     Align has a protectable interest in its goodwill associated with its ongoing business and commercial relationships with prospective and existing customers to whom Taylor was given access during the term of his employment with Align.

65.     The restrictions set forth in the Employment Agreement are reasonably related to protection of Align's protectable interests, are reasonable in time and place, and do not impose an undue hardship on Taylor, which is evidenced in part by the fact that Taylor was paid a substantial sum of money for his book of business.

66.     Pursuant to the Employment Agreement, Taylor agreed and acknowledged that a breach of the covenants contained in the non-competition, non-solicitation, and non-disclosure provisions would result in irreparable and continuing damage to Align for which there would be no adequate remedy at law, and, in the event of any breach, Align would be entitled to injunctive relief and such other and further relief, including damages, as may be proper.  **Exhibit 3**.

67.     Defendants' use of Align's confidential information and trade secrets, and Taylor's solicitation of Align's existing and prospective customers in the protected areas has proximately resulted in irreparable harm to Align, including the loss of customers, business, profits and goodwill, for which there is no adequate remedy at law.

68.     Align will continue to suffer damage and irreparable injury to its reputation and business if Taylor continues its wrongful conduct in breach of the Employment Agreement and interference with Align's accounts and contractual and business relations using Align's confidential information.

## II.     FRAUD AND FRAUD IN THE INDUCEMENT (Defendant Taylor)

69.     Align incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

70.     Taylor made material misrepresentations to Align regarding records of the Taylor Entities, falsely represented that commission payments were not owed to the customers' underwriter, and falsely asserted that it would not take the Taylor Entities' customers from Align after Align purchased the membership interest in the Taylor Entities.

71.     Taylor's representations were false.

72.     Taylor made these representations intentionally, recklessly, or negligently.  Taylor planned to take back the Taylor Entities' book of business after selling it to Align.

73.     Align reasonably relied upon Taylor's representations by purchasing the Taylor Entities.

74.     As a direct and proximate result of Taylor's fraud, Align was damaged in an amount to be determined at trial but in excess of $400,000.00.

## III.     PROMISSORY FRAUD (Defendant Taylor)

75.     Align incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

76.     Taylor falsely represented a material existing fact by promising that he would not solicit Align's customers.  Taylor made this representation intentionally.

77.     Align reasonably relied upon Taylor's representations by purchasing the Taylor Entities and by purchasing Taylor's membership interest in Align.

78.     At the time of Taylor's misrepresentation, Taylor had the intention not to perform the act promised and had an intent to deceive Align.

79.     As a direct and proximate result of Taylor's fraud, Align was damaged in an amount to be determined at trial but in excess of $400,000.00.

## IV.     WIRE FRAUD (All Defendants)

16

80.     Align incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

81.     Defendants perpetuated fraud by unlawfully obtaining Align's customers by sending emails and money across state lines, specifically including Alabama, Louisiana, and Florida.  For example, on November 17, 2022, Defendant Harper Kranz sent an email that crossed state lines in furtherance of Defendants' actions to unlawfully obtain Align's customers.  *See* **Exhibit 18**.

82.     Upon information and belief, in November and December of 2022, Defendants transferred money between Alabama and Louisiana in furtherance of the Scheme to Defraud Align.

83.     Upon information and belief, on November 29, 2022, Taylor and Kranz met at a hunting camp in Louisiana to strategize and plan regarding their Scheme to Defraud Align.

84.     Upon information and belief, in November and December of 2022, Defendants sent emails from Alabama to Gray Insurance (the underwriter for the customers Platinum wrongfully obtained) in Louisiana in furtherance of its conspiracy and Scheme to Defraud Align.

85.      Upon information and belief, in November and December of 2022, Defendants Taylor and/or Kranz sent emails from Alabama to Platinum in Louisiana concerning Align's customers in furtherance of its conspiracy and Scheme to Defraud Align.

86.     Further, Defendants sent emails to Align's customers in furtherance of their Scheme to Defraud Align.  *See e.g.*, **Exhibit 18**.  When those emails were sent, the emails were transmitted to a server located outside the State of Alabama.

87.     18 U.S.C. Section 1964 creates a private cause of action for persons and entities injured by violations of 18 U.S.C. Section 1962 (the federal Racketeer Influenced & Corrupt Organizations Act (RICO)).

88.     Plaintiff is a "person" within the meaning of 18 U.S.C. Sections 1961(3) and 1964(c).

89.     Defendants are "persons" within the meaning of 18 U.S.C. Sections 1961(3) and 1962.

90.     Defendants acted in concert to implement, conduct, and conceal the scheme to sell the Taylor Entities' book of business and then take back the customers for their own gain, which constitutes an "enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962 (the "Enterprise").

91.     Defendants engaged in wire fraud in violation of 18 U.S.C.A. § 1343 by sending wires from Alabama across state lines, specifically including Louisiana and Florida, in furtherance of their Scheme to Defraud Align.

92.     Defendants intentionally participated in the Scheme to Defraud Align of money and its customers and used mails and/or wires in furtherance of that scheme, and Align relied to his detriment on Taylor's misrepresentations and fraudulent statements.

93.     Defendants' illegal and infringing campaign, detailed above, including the underlying fraud constitutes "racketeering activity" as that term is defined in 18 U.S.C. Section 1961.

94.     Defendants' Scheme detailed above constitute a pattern of racketeering activity, as defined by 18 U.S.C. Section 1961.

95.     Through a pattern of racketeering activities, Defendants acquired or maintained, directly or indirectly, an interest in or control of the Enterprise, which was engaged in, or the activities of which, affect interstate commerce within the meaning of 18 U.S.C. Sections 1961(5) and 1962(b).

96.     Defendants were an owner of, employed by or associated with the Enterprise, which is engaged in, or the activities of which, affect interstate commerce, and Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and the Scheme, and conspired to do so, through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections 1961(5) and 1962(c).

97.     In violation of 18 U.S.C. § 1962(d), Defendants conspired and/or endeavored to violate the provisions of 18 U.S.C. §§ 1962 (a), (b) and (c).

98.     Defendants participated in conducting the affairs of an enterprise that is engaged in a pattern of racketeering activity.  In addition, Defendants conspired to conduct the affairs of an enterprise that is engaged in a pattern of racketeering activity.

99.     Defendants intentionally injured Plaintiff in its business and its property by engaging in a pattern of racketeering activity consisting of related and repeated acts of conversion, mail fraud, wire fraud, bank fraud, and other fraud in connection with the actions described herein.

100.     For the purpose of furthering this scheme to defraud and to obtain money by means of false pretenses, misrepresentations, or promises, Defendants knowingly utilized or caused to be utilized the United States Postal Service and utilized telephone and/or other wire transmissions in interstate commerce (wire fraud and mail fraud).

101.     These acts further include the transfer of funds as between themselves or others by using electronic or other wire transmissions in interstate commerce as described above.

102.     For the purpose of furthering its Scheme to Defraud Align and to obtain money and Align's business by false or fraudulent pretenses, Defendants transmitted and caused to be transmitted by wire these fraudulent transmissions and communications, as described herein, in violation of 18 U.S.C. § 1343.

103.     For the purpose of furthering its Scheme to Defraud Align and to obtain money and Align's customers' business by false or fraudulent pretenses, Defendants placed or caused certain matters or things, as described herein, to be placed in a post office or other authorized depository for mail matter in violation of 18 U.S.C. § 1341.

104.     Defendants violated 18 U.S.C. § 1962(a) by using or investing income derived from a pattern of racketeering to establish, operate and/or acquire interest in an enterprise the activities of which affect interstate commerce.

105.     Defendants violated 18 U.S.C. § 1962(b) because they engaged in a pattern of racketeering activity to acquire or maintain interest or control in an enterprise the activities of which affect interstate commerce.

106.     Defendants violated 18 U.S.C. § 1962(c) because they conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

107.     The Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate the above code sections.

108.     Further, in violation of O.C.G.A. § 1962, Defendants engaged in, or knowingly participated in, the operation of management of the Enterprise and the Scheme to Defraud Align through a continuing, related pattern of racketeering activity, as defined in 18 U.S.C. Section 1961(5), by engaging in theft of trade secrets in violation of 18 U.S.C. Section 1832.

109.     Defendants engaged in a scheme to defraud with the specific intent to defraud, and they used interstate wires in furtherance of the scheme.  In 2022, Defendants engaged interstate wire use in furtherance of their Scheme to Defraud Align in at least two instances.

110.     Moreover, Taylor had a duty to disclose information concerning commission payments to Gray Insurance in Louisiana.  Taylor failed to disclose such information as part of its Scheme to Defraud Align.

111.     Additionally, Defendant Taylor committed separate wire fraud by stealing $104,747.57 from Plaintiff and depositing said funds in his personal bank account.  The wire transfer of said funds involved interstate commerce because the wire was sent between Alabama and Mississippi.

112.     As a direct and proximate result of Defendants' wire fraud, Plaintiff was damaged in an amount to be determined at trial.

## V.     TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND BUSINESS EXPECTANCIES (All Defendants)

113.     Align incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

114.     Align had, and has, ongoing contractual and/or business relationships with its customers.

115.     Defendants were aware and knew of Align's existing contractual and/or business relationship with its customers.

116.     Defendants, through the actions described above, intentionally and without justification interfered with the existing relationships that Align has with its customers.

117.     Additionally, Defendants continue to interfere with other existing and prospective business relations of Align.

118.     Defendants intentionally interfered with Align's contractual and/or business relationships by soliciting Align's customers and diverting existing and potential future business opportunities from Align to Platinum in breach of Taylor's Employment Agreement.

21

119.   Defendants used confidential information and trade secrets gained from Taylor and Kranz's previous employment with Align to facilitate the solicitation of, and interference with, Align's existing and prospective customers and customer relationships for Defendants' benefit.

120.   Defendants' intentional and tortious conduct further undermined Align's current and prospective customer relationships, its ability to fulfill their current requirements, and its ability to obtain continued and new contracts or business with such customers.

121.   As a direct and proximate result of Defendants' interference with customer relationships and business expectancy, Align has been and will continue to be damaged and irreparably injured including present and future economic loss, loss of customer accounts, loss of customer relationships, lost profits, loss of goodwill, loss of its competitive position, diminished competitive advantage, and other damages and future damages which are incapable of exact proof.

122.   Defendants' actions were taken intentionally, maliciously, and with the intent to injure and/or oppress Align, thereby entitling Align to punitive damages.

## VI.   CONVERSION AND CIVL THEFT (Taylor)

123.   Align repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

124.   Defendant Taylor stole $104,747.57 from Align by using his access to Align's bank accounts to wire $104,747.57 from Align's bank account to an account he exercises dominion and control over and which Align does not have access to.

125.   Taylor, without authorization, exercised, and continues to exercise, ownership rights over $104,747.57 belonging to Align.

126.   As a direct and proximate result of Taylor's conversion and civil theft, Align suffered damages in an amount to be proven at trial but not less than $104,747.57, plus interest.

127.     Taylor's actions were taken intentionally, maliciously, and with the intent to injure and/or oppress Align, thereby entitling Align to punitive damages.

## VII.   UNFAIR COMPETION (All Defendants)

128.     Align incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint, as though fully set forth herein.

129.     Defendants' conduct described above constitutes a conversion of Align's profits, accounts, proprietary rights and interests, trade secrets and confidential information.

130.     Defendants' conduct was committed in bad faith, negligently, wantonly, recklessly, intentionally, willfully and deliberately and with the knowledge and intent of diverting business and assets from Align for their own personal gain and with the intent and knowledge of Align incurring expense and damage.

131.     As a consequence of the foregoing, Align suffered damage and will continue to suffer damage and irreparable harm, damage, and loss.

## VIII.  BREACH OF FIDUCIARY DUTIES (Taylor and Kranz)

132.     Align repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

133.     As former employees of Align, Defendants Taylor and Kranz owed fiduciary duties of loyalty, fidelity, fairness, and good faith to their employer, Align.  Those duties required Taylor and Kranz to act honestly for Align's best interest and to avoid acts of self-dealing.

134.     The duty of loyalty prohibits employees from soliciting an employer's customers for himself or competing with his employer while still employed.

135.    While working for Align, Taylor and Kranz accessed and retained Align's confidential and proprietary client information and used it for Defendants' gain in assisting Defendants in competing with Align and otherwise worked against Aligns interests.

136.    Taylor and Kranz, in breach of the duty of loyalty they owed to Align, actively worked against the interests of Align by soliciting customers from Align to Platinum during their employment with Align.

137.    Taylor and Kranz failed to act honestly and for Align's best interest and engaged in acts of self-dealing.

138.    Taylor and Kranz breached their fiduciary duties to Align.

139.    Taylor and Kranz's breaches of fiduciary duties were knowing and willful and were undertaken with malice.

140.    As a direct and proximate result of Taylor and Kranz's actions, Align suffered damages in an amount to be determined at trial.

## IX.    BREACH OF COVENANTS OF GOOD FAITH AND FAIR DEALING (Taylor)

141.    Align repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

142.    On August 4, 2020, Taylor and Align entered into an agreement for Align to purchase the membership interests of the Taylor Entities.  **Exhibit 1**.

143.    Additionally, on July 22, 2022, Taylor and Align entered into an agreement for Align to purchase Taylor's 20% membership interest in Align.  **Exhibit 2**.

144.    Good faith and fair dealing are required of all parties to a contract.

145.    Taylor owed duties to act in good faith and deal fairly by contracting with Align.

146.    Taylor breached his fiduciary duties of good faith and fair dealing by selling the Taylor Entities to Align and then soliciting the customers comprising the Taylor Entities' book of business to Platinum after the sale was complete.

147.    Taylor failed to act in good faith and deal fairly.

148.    As a direct and proximate result of Taylor's actions, Align suffered damages in an amount to be determined at trial.

**X.      CIVIL CONSPIRACY (All Defendants)**

149.    Align repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

150.    Defendants knowingly entered into a conspiracy.

151.    Defendants acted in concert to harm Align by way of tortious interference with business expectancy, tortious interference with contract, fraud, unfair competition, and conversion.

152.    Defendants committed overt acts in support and furtherance of their conspiracy to harm Align by way of tortious interference with business expectancy, tortious interference with contract, misappropriation of trade secrets, unfair competition, and conversion.

153.    Defendants overt acts in furtherance and support of their conspiracy to harm Align included, without limitation, sending emails and causing emails to be sent in furtherance of the Scheme to Defraud Align and mailing items and causing items to be mailed in furtherance of the Scheme to Defraud Align.

154.    Defendants' combined conspiratorial actions proximately caused damages to Align.

155.    Defendants acted with malice or, at a minimum, with reckless disregard for the consequences of their actions.

156.    Defendants combined, confederated, and conspired amongst themselves to intentionally interfere with Align's contractual and business relationships and business expectancy interests with its employees and customers.

157.    By the conduct described herein, Defendants combined and conspired among themselves and other unknown conspirators for the purpose of willfully and maliciously injuring Align's business.

158.    As a direct and proximate result of Defendants' actions, Align suffered damages in an amount to be determined at trial.

## XI.    UNJUST ENRICHMENT (All Defendants)

159.    Align repeats and re-alleges the foregoing paragraphs as though fully set forth herein.

160.    As a result of the foregoing described actions, Defendants received benefits at Align's expense, and their retention of that benefit would result in injustice.

161.    Therefore, Defendants were unjustly enriched at Align's expense in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Align Insurance Group, LLC requests that the Court award it the following relief:

(a)    Preliminary and permanent injunctive relief under Fed. R. Civ. P. 65 including but not limited to: (i) preventing Defendants from using any of Align's property, information, or business opportunities for his, her, its, or their benefit or advantage; (ii) preventing Defendants from using or otherwise misappropriating Align's trade secrets; (iii) preventing Taylor, Kranz, or any former employee under the employ of Defendants, or anyone acting in concert with them, from soliciting Align's employees to leave Align's employment; (iv) preventing Defendants, or

anyone acting in concert with them, from hiring any Align employee to work for a competing business; (v) preventing Defendants, or anyone acting in concert with them, from soliciting clients away from Align; (vi) preventing Defendants, or anyone acting in concert with them, from accepting business from any Align customers or former customers on behalf of a competing business; and (vii) preventing Defendants, or anyone acting in concert with them, from servicing any Align customers on behalf of a competing business.

(b)     Equitable tolling to extend the term of the Defendant Taylor's Employment Agreement beyond the time period specified in the Agreement to account for the time he has been in violation of their Agreement;

(c)     An accounting of all property Defendant(s) took, or allowed others to take, from Align and all electronic data they removed, copied, or deleted, or allowed others to remove, copy, or delete, from Align's computer systems, cell phones, and other equipment;

(d)     An accounting of gross profits achieved by, and any compensation, commission, bonus, salary, gratuity, emolument, or other gain received, directly or indirectly, by Defendants in any transaction connected to their wrongful conduct;

(e)     Compensatory damages, past and future, in an amount adequate to compensate Align for its lost business and the injury to its goodwill, among other actual damages;

(f)     Nominal damages;

(g)     Punitive damages;

(h)     Pre and post-judgment interest at the maximum rate allowed by law;

(i)     Attorneys' fees, expenses, and costs incurred by virtue of this action;

(j)     Return of the $104,747.57 Defendant Taylor unlawfully converted from Plaintiff;

(k)     Trial by jury on all matters triable to a jury; and

(l)     Such other and further relief, in law or equity, as the Court may deem just and appropriate under the circumstances.

Respectfully Submitted,

*/s/ Greg Bordenkircher*

Greg Bordenkircher
AL Bar No. 8320S17S
*Counsel for Align Insurance Group, LLC*

General Counsel
68 VENTURES, LLC
Align Insurance Group, LLC
707 Belrose Ave.
Daphne, AL 36526
(251) 625-1198
greg@68ventures.com

*/s/ Ty R. Bordenkircher*

Ty R. Bordenkircher
AL Bar No. 1363H43E
*Counsel for Align Insurance Group, LLC*

ROSE LAW FIRM
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
(501) 375-9131
(501) 375-1309 – Fax
tbordenkircher@roselawfirm.com